IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Holding a Criminal Term
Grand Jury Sworn in on January 8, 2016

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. |
| | : | |
| | : | Grand Jury Original |
| v. | : | |
| | : | 18 U.S.C. § 1031(a) |
| | : | (Major Fraud Against the United States) |
| AZAM DOOST, | : | |
| also known as | : | 18 U.S.C. § 1343 |
| ADAM DOOST, | : | (Wire Fraud) |
| MOHAMMAD AZAM DOOST, and | : | |
| MOHAMMAD AZIM, | : | 18 U.S.C. § 2 |
| | : | (Aiding and Abetting, Causing an Act to |
| Defendant. | : | be Done) |
| | : | |
| | : | 22 U.S.C. § 2197(n) |
| | : | (False Statement on Loan Application or |
| | : | Extension) |
| | : | |
| | : | 18 U.S.C. § 1956(a)(1)(B)(i) |
| | : | (Money Laundering) |
| | : | |
| | : | 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(1) |
| | : | 28 U.S.C. § 2461(c) |
| | : | (Criminal Forfeiture) |

**INDICTMENT**

The Grand Jury charges that:

General Allegations

At all relevant times to this Indictment, unless otherwise stated:

The Defendant

1. Defendant Azam Doost, also known as Adam Doost, Mohammad Azam Doost and Mohammad Azim ("DOOST"), was a dual Afghan and United States citizen. He co-owned with his brother ("Doost's brother") Equity Capital Mining, LLC ("ECM"), an Afghan company which

was subsequently incorporated in the State of Delaware between on or about June 8, 2010 and on or about March 1, 2012.

U.S. Government Agencies or Funded Organizations

2. The Overseas Private Investment Corporation ("OPIC") was an agency of the United States government headquartered in Washington, D.C. It supported investments by the United States government in emerging markets worldwide to foster the development and growth of free markets.

3. The United States Agency for International Development ("USAID") was an agency of the United States government headquartered in Washington, D.C. It was the lead U.S. government agency that worked to end extreme global poverty and enable resilient democratic societies to realize their potential. USAID, in part, fulfilled its mission by funding and sponsoring development programs around the world.

4. ACDI/VOCA was a private, international development nonprofit organization based in Washington, D.C. As part of its operations, it founded the Afghan Rural Finance Company ("ARFC") as a nonbank financial institution registered as a limited liability company under the USAID-funded ARIES project. ARFC encouraged investment in the rural economy of Afghanistan and supported economic and social development by serving the credit needs of small, medium and large enterprises in rural communities. ARFC's main office was in Kabul, Afghanistan. It became a standalone company in or about December 2009.

5. The Afghanistan Small and Medium Enterprise Development ("ASMED") was a program sponsored by USAID with its headquarters in Bethesda, Maryland which provided a full range of business development services to small and medium-sized enterprises and their

2

supporting private sector institutions. USAID implementing partner Development Alternatives Incorporated ("DAI") administered the ASMED program and issued approved funding.

DOOST's Companies and Affiliated Equipment Vendors

6. In or about 2006, ECM obtained a 10-year lease from the Afghanistan Ministry of Mines for the rights to mine marble at the White Dove Marble Mine (the "Marble Mine") located in Chishti-i-Sharif, Afghanistan.

7. ECM was a subsidiary of Equity Capital Group, which was also owned and operated by DOOST and his brother, and located in Dubai, United Arab Emirates ("UAE").

8. Equity Capital Group also owned the Chishti Sharif Marble Company factory ("the Marble Factory"), which opened on or about May 25, 2011, in Herat, Afghanistan. DOOST served as the President of the Marble Factory; his business partner ("Business Partner") served as the Vice-President. Between in or about June 2009 and January 2010, DOOST obtained loans and grants from ARFC and ASMED/DAI to pay for equipment at the proposed Marble Factory, as well as the Marble Mine.

9. Equity Capital Trading LLC ("Equity Capital Trading"), also a subsidiary of Equity Capital Group, was owned and operated by DOOST and his brother, and located in Dubai, UAE. DOOST's Business Partner was also a partner of Equity Capital Trading.

10. Gaspari Menotti SpA ("Gaspari Menotti") was a company based in Carrera, Italy, with a bank account in Massa, Italy, which manufactured special industry machinery for plants that processed natural stone, including marble.

11. Afghan Stone Ltd. ("Afghan Stone") was a purported company located in Kabul, Afghanistan, that was operated by a partner of Equity Capital Trading ("Afghan Stone Partner") and acted as a purported supplier to ECM. It had a bank account at the Afghanistan International

Bank in Kabul, Afghanistan, account number xxxxxxxxx6711, opened on or about March 8, 2010) ("Afghan Stone bank account"). It also had a second bank account at the Maiwand Bank in Kabul Afghanistan, account number xxxxxxxxx9913 ("Afghan Stone bank account #2"). DOOST's Business Partner was listed as a contact person for the Afghan Stone bank account and an authorized signature authority for the Afghan Stone bank account #2.

12. Logistic Saheb Zada Co. Ltd ("Saheb Zada") was a purported company located in Kabul, Afghanistan, that was operated by a partner of Equity Capital Trading ("Saheb Zada Partner") and acted as purported supplier to ECM. It had a bank account at the Afghanistan International Bank in Kabul, Afghanistan, account number xxxxxxxxxxxx5017, opened on or about November 14, 2009 ("Saheb Zada bank account"). DOOST was listed with the bank as the President of Saheb Zada and DOOST's Business Partner was listed as an authorized person for that account.

13. Big Five Logistic World Trading ("Big Five") was a purported company located in Kabul, Afghanistan, that was operated by a partner of Equity Capital Trading ("Big Five/Diversified World Partner"), and acted as a purported supplier to ECM. It had a bank account at the Afghanistan International Bank in Kabul, Afghanistan, account number xxxxxxxxxxxx5518, opened on or about June 19, 2010 ("Big Five bank account"). DOOST's Business Partner was listed with the bank as an authorized signature for that account.

14. Diversified World General Trading ("Diversified World") was a purported company located in Dubai, UAE that was operated by the Big Five/Diversified World Partner and acted as a purported supplier to ECM. It had a bank account at the Emirates Bank International in Dubai, U.A.E., account number xxxxxxxxx5102 ("Diversified World bank account").

4

<u>Loan Money Sought and Obtained by ECM from OPIC and Subsequent Default</u>

15. On or about November 1, 2009, DOOST, acting as the representative of ECM, submitted and caused to be submitted to OPIC a loan request for the amount of $15,800,000.

16. On or about February 19, 2010, DOOST executed a loan agreement with OPIC where OPIC agreed to provide up to $15,800,000 of a Total Project Cost of $31,470,000. The term of the loan was seven years, approximately the time remaining on ECM's lease of the Marble Mine. The agreement provided that the loan proceeds were to be applied exclusively to the Project, which was defined as "the development, maintenance and operation of [the Marble Mine] for export sale of block marble to markets in Italy, Turkmenistan, Turkey and Saudi Arabia." The loan agreement further required quarterly reports from ECM "setting forth in reasonable detail all transactions between the borrower [ECM], on the one hand, and a Shareholder [DOOST and his brother] or any Affiliate of a Shareholder, on the other hand[.]" An "Affiliate' was defined in the loan agreement, in relevant part, as "with respect to any Person, (i) any other Person that is directly or indirectly controlled by, under common control with, or controlling such Person; . . . (iii) any officer or director of such Person; or (iv) any spouse or relative of such Person." In relevant part, "Person" was defined in the loan agreement as "an individual, a legal entity, including a partnership, a joint venture, a corporation, a trust, and an unincorporated organization[.]" The only Affiliates reported to OPIC by DOOST and his brother in the loan agreement were Sunlight Gems in the United States and Hong Kong, China, and Equity Capital Trading.

17. Once ECM received approval of the OPIC loan, over the course of the next eight months, DOOST and his business consultant ("Consultant") submitted to OPIC, via email or in person, three requests to disburse loan funds on or about the following dates: April 18, 2010 for $7,000,000; July 15, 2010 for $7,000,000; and November 28, 2010 for $1,800,000. With each

disbursement request, DOOST and his Consultant submitted invoices from the various vendors, including those listed in paragraphs 10-14 above, from which they allegedly purchased equipment, as well as operating expenses for ECM and, in the first request, a consulting fee for the Consultant. OPIC issued the requested funds directly to the vendors based on these documents and banking information submitted by ECM.

18. Despite the requirements of the loan agreement, DOOST and his Consultant, when they submitted their disbursement requests for OPIC to wire funds covered under terms of the loan, did not reveal DOOST's affiliation with the vendors to which they were requesting OPIC wire funds, did not reveal that DOOST had a financial interest in the actions of those vendors, and did not reveal invoices that had already been paid by other U.S. government funded organizations.

19. Further, despite the requirements of the loan agreement and disbursements having been made by OPIC, ECM made no principal payments on the loan. Rather, DOOST told OPIC alleged reasons why ECM could not repay the principal on the loan and what interest was paid was only made as part of the disbursement process. As a result, the loan went into default with a principal balance of approximately $15,800,000 and past due interest of approximately $1,913,788.99.

## COUNTS ONE THROUGH THREE
### Major Fraud Against the United States
### (18 U.S.C. §§ 1031(a) and 2)

1. Paragraphs 1 through 19 of the General Allegations section of this Indictment are re-alleged and incorporated by reference as if set out in full.

### Scheme and Artifice

2. From in or about November 2009 and continuing through in or about July 2014, in the District of Columbia, and elsewhere, defendant AZAM DOOST, also known as Adam Doost, Mohammad Azam Doost, and Mohammad Azim ("DOOST"), and others, known and unknown to

the Grand Jury, in a loan from the United States, where the amount of the loan was $1,000,000 or more, did knowingly execute and attempt to execute a scheme and artifice with the intent: (a) to defraud the United States; and (b) to obtain money and property by means of materially false and fraudulent pretenses, representations and promises.

### Purpose of the Scheme and Artifice

3.  It was the purpose of the scheme and artifice for the defendant and his associates to unlawfully enrich themselves by applying for and obtaining a loan from OPIC, a United States government agency, by making materially false and fraudulent representations, and concealing and omitting to state material facts concerning, among other things, the nature and cost of the equipment purchased with the loan proceeds, the use of such equipment, the use of loan proceeds, and the financial interest of defendant in the transactions. It was further the purpose of the scheme and artifice for the defendants and others to divert the loan proceeds for their own use, to conceal and disguise the location, ownership and control of the loan proceeds, and to fail to repay the loan.

### Manner and Means of the Scheme and Artifice

4.  The manner and means by which DOOST and others sought to accomplish the object and purpose of the scheme and artifice included, among other things:

a.  DOOST and others would obtain a $15,800,000 loan from OPIC, a U.S. government agency, for development, maintenance and operation of the Marble Mine. Thereafter, DOOST and others would submit requests for disbursement of loan funds to cover alleged reimbursable costs of the Marble Mine.

b.  DOOST and his Consultant would submit invoices to OPIC falsely claiming they were for expenses at the Marble Mine to obtain loan money from OPIC.

7

c. DOOST would report to OPIC that he did not have an affiliation with any companies other than those mentioned in paragraph 16 of the General Allegations and, as of on or about December 13, 2010, the Marble Factory, when in fact he had financial relationships with several vendors from which he purported to purchase equipment for the Marble Mine, which were funded by OPIC.

d. DOOST and his Consultant would submit invoices to OPIC for expenses purportedly related to the Marble Mine that had, in fact, already paid for, in whole or in part, by ARFC and ASMED/DAI.

e. DOOST and his Business Partner would cause to be listed on certain ECM vendor bank account DOOST's Business Partner as an authorized person to access that account, and then upon receipt of OPIC funds to the alleged ECM vendors' bank account, cause transfer of funds from those vendors to companies and individuals with whom DOOST was associated, or to pay debts DOOST owed.

f. DOOST's Consultant would receive a commission of $444,000 for his alleged consulting services with the first disbursement from OPIC, and, shortly after, $40,000 would be wire transferred from this account to the bank account of Sunlight Gems in California (a DOOST company).

g. When the time came for ECM to repay the loan to OPIC, DOOST would provide alleged reasons to OPIC why it was not able to make those repayments at a time when DOOST had control of sufficient funds to make those repayments.

h. DOOST and his brother would fail to repay any of the principal, and only a limited amount of the interest, on the OPIC loan and ultimately would default on the loan.

8

**Execution of the Scheme and Artifice**

5. On or about the respective dates below, in Washington, D.C. and elsewhere, defendant DOOST and others, known and unknown to the Grand Jury, did knowingly execute and attempt to execute the scheme and artifice, with the intent to defraud the United States of America and to obtain money and property by means of false and fraudulent pretenses, representations, or promises, to wit:  DOOST and his Consultant submitted to OPIC, via email or in person, three disbursement requests:

| COUNT | APPROXIMATE DATE | APPROXIMATE AMOUNT SOUGHT |
| --- | --- | --- |
| One | April 18, 2010 | $7,000,000 |
| Two | July 16, 2010 | $7,000,000 |
| Three | November 28, 2010 | $1,800,000 |

All in violation of Title 18, United States Code, Sections 1031(a) and 2.

**COUNTS FOUR THROUGH ELEVEN**
**Wire Fraud**
**(18 U.S.C. § 1343)**

1. Paragraphs 1 through 19 of the General Allegations section of this Indictment are re-alleged and incorporated by reference as if set out in full.

2. From in or about November 2009, through in or about July 2014, as specified in each count below, in the District of Columbia, and elsewhere, defendant AZAM DOOST, also known as Adam Doost, Mohammad Azam Doost, and Mohammad Azim ("DOOST"), and others known and unknown to the Grand Jury, did knowingly and with the intent to defraud by means of materially false and fraudulent pretenses, representations, and promises, knowing the pretenses, representations and promises were false and fraudulent when made, and did transmit and cause to be transmitted by means of wire, radio, and television communications in interstate and foreign

commerce, writings, signs, signals, pictures, and sounds for the purpose of executing the scheme and artifice.

### Purpose of the Scheme and Artifice

3. The purpose of the scheme and artifice was for DOOST and others to unlawfully enrich themselves by defrauding OPIC by submitting false and fraudulent invoices and documentation to OPIC, concealing their financial interest in the vendors to which they sought funds be sent by OPIC, misappropriating loan proceeds for their personal benefit, and concealing the location, ownership and control of the loan proceeds.

### Scheme and Artifice

4. Paragraphs 4a through 4h of the Manner and Means section of Counts One through Three of the Indictment are re-alleged and incorporated by reference as though fully set forth below as a description of the Scheme and Artifice.

### Use of the Wires

5. On or about the dates set forth below, in the District of Columbia, and elsewhere, for the purpose of executing the above-described scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made, the defendant, and others known and unknown to the Grand Jury, did knowingly transmit and cause to be transmitted in interstate and foreign commerce, by means of wire communications, certain writings, signs, signals, and sounds, as set forth in each count below:

| COUNT | APPROXIMATE DATE | DESCRIPTION OF WIRE COMMUNICATION |
|---|---|---|
| Four | April 30, 2010 | Wire transfer from OPIC in Washington, D.C., to the U.S. Treasury in Kansas City, Missouri requesting wire transfer of $596,000 to the Gaspari Menotti bank account |

| Five | April 30, 2010 | Wire transfer from OPIC in Washington, D.C., to the U.S. Treasury in Kansas City, Missouri requesting wire transfer of $821,742 to the Afghan Stone bank account |
| Six | April 30, 2010 | Wire transfer from OPIC in Washington, D.C., to the U.S. Treasury in Kansas City, Missouri requesting wire transfer of $724,000 to the Saheb Zada bank account |
| Seven | July 21, 2010 | Wire transfer from OPIC in Washington, D.C., to the U.S. Treasury in Kansas City, Missouri requesting wire transfer of $1,120,000 to the Afghan Stone bank account |
| Eight | July 21, 2010 | Wire transfer from OPIC in Washington, D.C., to the U.S. Treasury in Kansas City, Missouri requesting wire transfer of $1,288,000 to the Saheb Zada bank account |
| Nine | July 21, 2010 | Wire transfer from OPIC in Washington, D.C., to the U.S. Treasury in Kansas City, Missouri requesting wire transfer of $1,660,000 to the Big Five bank account |
| Ten | July 21, 2010 | Wire transfer from OPIC in Washington, D.C., to the U.S. Treasury in Kansas City, Missouri requesting wire transfer of $1,170,000 to the Diversified World bank account |
| Eleven | December 15, 2010 | Wire transfer from OPIC in Washington, D.C., to the U.S. Treasury in Kansas City, Missouri requesting wire transfer of $1,561,000 to the Diversified World bank account |

All in violation of Title 18, United States Code, Section 1343.

## COUNTS TWELVE THROUGH THIRTEEN
### False Statement on Loan Application or Extension
### (22 U.S.C. § 2197(n) and 18 U.S.C. § 2)

1. Paragraphs 1 through 19 of the General Allegations section of this Indictment are re-alleged and incorporated by reference as if set out in full.

2. On or about the date as specified in each count below, in the District of Columbia, and elsewhere, defendant AZAM DOOST, also known as Adam Doost, Mohammad Azam Doost, and Mohammad Azim ("DOOST"), knowingly made a false statement or report for the purpose of influencing the action of OPIC with respect to a loan or any change or extension of the loan, as specified in each count below:

11

| COUNT | APPROX. DATE | FALSE STATEMENT BY DOOST | WHEN IN TRUTH AND FACT, AS DOOST WELL KNEW |
|---|---|---|---|
| Twelve | Between on or about April 18, 2010 and April 30, 2010 | A "Project Cost" for the Marble Mine was a Blockcutter for $596,000 | No Blockcutter was purchased from Gaspari Menotti by ECM for the Marble Mine. |
| Thirteen | Between on or about April 18, 2010 and April 30, 2010 | A "Project Cost" for the Marble Mine were two Faudi chainsaws | The chainsaws were not an expense of ECM because they had already been paid for by ASMED/DAI. |

All in violation of Title 22, United States Code, Section 2197(n), and Title 18, United States Code, Section 2.

## COUNTS FOURTEEN THROUGH FIFTEEN
### False Statement on Loan Application or Extension
### (22 U.S.C. § 2197(n))

1. Paragraphs 1 through 19 of the General Allegations section of this Indictment are re-alleged and incorporated by reference as if set out in full.

2. On or about the date as specified in each count below, in the District of Columbia, and elsewhere, defendant AZAM DOOST, also known as Adam Doost, Mohammad Azam Doost, and Mohammad Azim ("DOOST"), knowingly made a false statement or report for the purpose of influencing the action of OPIC with respect to a loan or any change or extension of the loan, as specified in each count below:

| COUNT | APPROX. DATE | FALSE STATEMENT BY DOOST | WHEN IN TRUTH AND FACT, AS DOOST WELL KNEW |
|---|---|---|---|
| Fourteen | July 15, 2010 | "For the financial quarters ending March 31st and June 30th 2010, there were no affiliate transactions that occurred." | DOOST had affiliations with Afghan Stone and Saheb Zada during the quarter ending June 30, 2010 |
| Fifteen | December 13, 2010 | That there were no affiliate transaction that occurred during the quarter ending September 30, 2010 | DOOST had an affiliation with Afghan Stone, Saheb Zada, Big Five and Diversified World during the quarter ending September 30, 2010. |

All in violation of Title 22, United States Code, Section 2197(n).

## COUNT SIXTEEN THROUGH TWENTY-THREE
### Money Laundering
### (18 U.S.C. §§ 1956(a)(1)(B)(i) and 2)

1. Paragraphs 1 through 19 of the General Allegations section and Counts Four through Eleven of this Indictment are re-alleged and incorporated by reference as if set out in full.

2. On or about the date specified in each count below, in the District of Columbia, and elsewhere, defendant AZAM DOOST, also known as Adam Doost, Mohammad Azam Doost, and Mohammad Azim ("DOOST"), did knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, to wit, the financial transaction described for each count, which involved the proceeds of a specified unlawful activity, that is, wire fraud, knowing the transaction was designed in whole and in part to conceal and disguise from, among others, OPIC, the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity and that while conducting and attempting to conduct such financial transaction knew the property involved in the financial transaction represented the proceed of some form of unlawful activity.

| COUNT | APPROX. DATE | FINANCIAL TRANSACTION |
|---|---|---|
| Sixteen | May 2, 2010 through May 6, 2010 | DOOST's Business Partner withdrew approximately $821,000 in cash from the Afghan Stone bank account into which the money from OPC was wired |
| Seventeen | May 5, 2010 | Approximately $700,000 was wire transferred from Saheb Zada's bank account into which the OPIC money was wired to the Afghan Stone bank account #2 |
| Eighteen | July 22, 2010 | Approximately $1,622,000 was wire transferred from the Big Five bank account into which the OPIC money was wired to the Diversified World bank account |
| Nineteen | July 24, 2010, | DOOST's Business Partner withdrew approximately $1,118,000 in cash from the Afghan Stone bank account into which the money from OPIC was wired |
| Twenty | July 27, 2010 | Approximately $1,240,000 was wire transferred from the Saheb Zada bank account into which the OPIC |

|  |  | money was wired to the Diversified World bank account |
| --- | --- | --- |
| Twenty-One | January 28, 2011 | Approximately €25.000 ($34,715) was wire transferred from the Diversified World bank account to the bank account of Gaspari Menotti in Italy as payment toward the remaining approximately $300,000 balance DOOST personally owed on the marble processing machines purchased for the Marble Factory |
| Twenty-Two | February 22, 2011 | Approximately $20,000 was wire transferred from the Diversified World bank account to DOOST's E*Trade Investment account in the United States |
| Twenty-Three | August 31, 2011 | Approximately $6,000 was wire transferred from the Diversified World bank account to DOOST's wife's bank account in California |

All in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

## FORFEITURE ALLEGATIONS
### (18 U.S.C. §§ 981(a)(1)(C) and 982(a)(1); 28 U.S.C. § 2461(c))

1. The General Allegations and the allegations of Counts Four through Eleven and Sixteen through Twenty-Three in this Indictment are re-alleged and incorporated fully herein by reference for the purpose of alleging forfeiture to the United States of America of certain property in which the defendant, AZAM DOOST, also known as Adam Doost, Mohammad Azam Doost, and Mohammad Azim ("DOOST"), has an interest.

2. Upon conviction of any violation of Title 18, United States Code, Section 1343, as alleged in Counts Four through Eleven of this Indictment, DOOST shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to the commission of the offense, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

3. Upon conviction of any violation of Title 18, United States Code, Section 1956, as alleged in Counts Sixteen through Twenty-Three of this Indictment, DOOST shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds

14

traceable to the commission of the offense, pursuant to Title 18, United States Code, Section 982(a)(1).

4. The property subject to forfeiture includes, but is not limited to approximately $15,800,000 which represents a sum of money derived from the commission of the alleged wire fraud and money laundering offenses.

5. If any of the property described above, as a result of any act or omission of the defendant:

      a.     cannot be located upon the exercise of due diligence;

      b.     has been transferred or sold to, or deposited with, a third party;

      c.     has been placed beyond the jurisdiction of the court;

      d.     has been substantially diminished in value; or

      e.     has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant, up to the value of the above forfeitable property, and in addition, to require the defendant to return any such property to the jurisdiction of the court for seizure and forfeiture.

//

//

//

//

//

//

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), as incorporated by Title 28, United States Code, Section 2461(c), Title 18, United States Code, Section 982(a)(1) and (3), and the procedures set forth in Title 21, United States Code, Section 853.

A TRUE BILL

_____
FOREPERSON

SANDRA L. MOSER
ACTING CHIEF, FRAUD SECTION
CRIMINAL DIVISION
UNITED STATES DEPARTMENT OF JUSTICE

By: _____
DANIEL P. BUTLER
TRIAL ATTORNEY, FRAUD SECTION

16