**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                )
UNITED STATES OF AMERICA,                       )
                                                )
    Plaintiff,                        )
                                                )
        v.                )    Criminal No. 1:17-CR-00109 (APM)
                                                )
AZAM DOOST,                                     )
                                                )
    Defendant.                        )
_____)

**GOVERNMENT'S REPLY TO DEFENDANT'S**
**SENTENCING MEMORANDUM, ECF #107**

The United States, by and through its undersigned counsel, respectfully submits this reply

to Azam Doost's ("defendant") sentencing memorandum, ECF #107. As discussed below, the

government respectfully submits that the Court should reject defendant's arguments regarding the

total offense level, including as to loss amount, in the pre-sentence report ("PSR"), ECF #117. The

Court should also, after rejecting defendant's request for a departure or variance from the

applicable sentencing guidelines, sentence defendant within the guidelines range, and order

defendant to pay restitution and forfeiture of $8,940,742 each.

**ARGUMENT**

**1.  The Court should accept the loss calculation in the PSR.**

The government proved "that the total intended and actual loss to [the Overseas Private

Investment Corporation ("OPIC")] as a result of the defendant's scheme was $8,940,742." ECF

#117 at 13, ¶44 (PSR). Nevertheless, defendant claims the loss as a result of his actions was, at

most, $838,392 because, according to him, all but this amount of the $15.8 million loan has been

accounted for. ECF #107 at 10-12. As evidence, he refers to (1) audits showing that Equity Capital

1

Mining ("ECM") had millions of dollars of assets from 2010-2012, (2) documents prepared as part of OPIC's sale of the loan to the Greengate Group ("Greengate") in 2014, which he contends prove that "numerous pieces of equipment – equipment that the Government alleged were never purchased – were in fact both present and accounted for at ECM in 2014," and (3) reports prepared by his accountants. *Id.* at 10-11.

The government addressed these documents in its opposition to defendant's combined post-trial motion. ECF #106 at 12-15. Here, defendant continues to misstate their import. First, while the audits show that ECM may have had assets in the stated amounts, they do not provide any details of the nature of the assets. Second, the Greengate documents do not link the equipment listed therein to the equipment listed on the fraudulent invoices that defendant submitted to OPIC. Finally, defendant's assertion that his accountants "produced a document showing that most, if not all of the equipment alleged to have never been purchased was not only purchased, but was fully accounted for in the sale to Greengate," is simply not true. As the accountants qualified in their report, their analysis "did not include – physically observing the equipment, matching of serial numbers of the equipment from the purchase orders, [or] tracking the funds from either OPIC or Doost entities bank accounts to vendors." Defense Exhibit 18 to ECF #107 at 1.

The Court should accept the government's estimation of OPIC's loss ($8,940,742) because it equals the total value of the loan proceeds that defendant obtained by submitting false and/or fraudulent invoices to OPIC (*i.e.* the wire fraud counts). Under the Sentencing Guidelines, the Court need only make a reasonable estimation of the loss. U.S.S.G. § 2B1.1, App. Note 3(C); *United States v. Gottfried*, 58 F.3d 648, 651 (D.C. Cir. 1995) (loss need not be determined with precision). The factors the Court considers in calculating the appropriate loss amount include, but are not limited to, the "fair market value of the property unlawfully taken." U.S.S.G. § 2B1.1, App.

Note 3(C)(i). The Court, however, may not include "interest of any kind" in the loss, and must credit "money returned" to the victim. U.S.S.G. § 2B1.1, App. Note 3(D)(i) and (E)(i).

OPIC sold the loan to Greengate for $2.4 million, resulting in a real loss to OPIC on the $15.8 million loan of $13.4 million.[1] Trial Transcript 9/13/2018, a.m., at 694. Thus, the government could have sought a loss amount of $13.4 million, but instead, took a conservative approach in arguing for a loss value of $8,940,742, the total of the funds that defendant obtained by wire fraud. This figure accounts for defendant's argument that he used some of the loan proceeds for equipment or working expenses for the Marble Mine. For example, defendant submitted invoices for Caterpillar equipment worth $3.4 million as part of the first disbursement request, but Special Agent Carleen Watts testified that she did not find any indicia of fraud in her review of the Caterpillar invoices. Government Trial Exhibits 100, 821. Trial Transcript, 9/13/2018, a.m., at 748 (Q: "And why did you not focus in on the other invoices?" A: Allied cat is the Caterpillar distributor. I actually did go to Caterpillar here in the United States and they verified that [Al Saka] is a [sic] actual authorized dealer in Afghanistan"). Thus, the government did not include those invoices in the indictment or its calculation of OPIC's loss.

Defendant is not entitled to any offset of OPIC's loss. The OPIC loan was not a grant, and as such, it would be inappropriate to compare defendant's fraud to a product substitution case where, for example, a brand name product was replaced with a generic, U.S.S.G. § 2B1.1, App. Note 3(A)(v)(1), or a product was purchased from dealer #1 versus dealer #2.

The United States extended $15.8 million of credit to defendant for the development of a Marble Mine in Afghanistan, expecting to be paid back in full. Defendant obtained the loan

---

[1] At the time the loan was sold to Greengate, defendant's obligation to OPIC was actually close to $20 million including outstanding principal, interest, and fees. Defendant's Exhibit 9 at 2 (ECF-107-9).

proceeds by fraud and deceit, paid zero principal, and only paid the interest that was necessary to continue the loan disbursements. Accordingly, the government respectfully submits that the Court should find the appropriate loss amount is $8,940,742.

**2. Similarly, the Court should accept the restitution calculation in the PSR.**

The Court should order defendant to pay restitution in the amount of $8,940,742 to compensate OPIC for its loss as a result of his fraud. *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012) (the purpose of restitution is compensatory).

Defendant's argument that he did not cause OPIC's loss because OPIC independently negotiated the sale of the loan to Greengate unduly minimizes his role in creating the loss in the first place. As the sole signatory on the Loan Agreement, defendant was responsible for repaying the loan, and his failure to make the principal payments forced OPIC to hold him in default. Government Trial Exhibit 39; Trial Transcript, 9/11/2018, p.m., at 447; Government Trial Exhibit 812 ("[O]ne or more Events of Default have occurred and are continuing"). As defendant was responsible for defaulting on the loan and creating OPIC's loss in the first instance, he should be responsible for compensating OPIC.

Defendant's claims that OPIC could have received more from the sale of the loan are speculative and misleading. First, as to his claim that OPIC could have collected the full loan amount from Greengate, nowhere in the trial record, or in the evidence defendant proffers, is it suggested that Greengate offered to step into defendant's position and repay the outstanding principal and interest to OPIC. Second, defendant misleadingly suggests that OPIC accepted $2.4 when it could have had $8 million. As the court knows, OPIC evaluated the two purchase offers on a *present value* basis and elected to accept $2.4 million. Trial Transcript, 9/13/2018, a.m., at 695 ("Again, there is a concept of present value, and when we looked at the opportunity to get

4

cash up front and compared that to cash over time, we chose the cash up front because when you present value a stream of cash over time, it is reduced and we felt the 2.4 in the hand was a better opportunity"); Defense Exhibit 9 to ECF #107 at 7-8 (explaining the present value analysis that OPIC undertook).

The government respectfully submits the Court should reject defendant's arguments and order him to pay restitution of $8,940,742. This would compensate OPIC for its actual loss as a result of the fraudulent invoices that defendant submitted.[2]

**3. The Court should find that defendant was an organizer or leader under the sentencing guidelines.**

Defendant claims that the Probation Officer incorrectly applied a four-level increase to his total offense level for being an organizer or leader of his criminal activity U.S.S.G. § 3B1.1(a). ECF #107 at 15; ECF #117 at 15, ¶57 (PSR).

a. <u>Organizer or leader</u>

In determining whether defendant was an organizer or a leader, the Court should consider factors including, but not limited to, defendant's exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. *United States v. Olejiya*, 754 F.3d 986, 990 (D.C. Cir. 2014). No single factor is dispositive. *Id*.

Here, the factors clearly show, by a preponderance of the evidence, that defendant was an

---

[2] Defendant should also forfeit $8,940,742. The government's arguments regarding forfeiture are set forth in its Motion for Preliminary Order of Forfeiture, ECF #60, Memorandum in Aid of Sentencing, ECF #97 at 11-12, and Reply to Defendant's Opposition to its Motion for a Preliminary Order of Forfeiture, ECF #120 at 2-5.

organizer or leader of his criminal activity. *United States v. O'Brien* 560 U.S. 218, 224 (2010) (sentencing factors can be proved by a preponderance of the evidence). First, he exercised all of the decision making authority regarding the OPIC loan. Government Trial Exhibits 38-40 (loan documents). He was also personally responsible for obtaining and/or preparing the fraudulent invoices submitted to OPIC to obtain the loan proceeds, and either supplied them to OPIC directly, or directed his business consultant, Majdood Popal ("Popal"), to supply them. *See, e.g.*, Government Trial Exhibits 8 (defendant obtained block cutter invoice from Gaspari Menotti); 402 (defendant sent Gaspari Menotti invoice to Popal); 403-4 (defendant sent Saheb Zada invoices to Popal). Where Popal submitted documents to OPIC, the evidence showed that he often asked for defendant's permission first. *See, e.g.*, Trial Exhibit 400 ("Attached is the disbursement request. Check out the excel file. The amount exceeds $7 million. Please let me know what to do and I will call tomorrow to discuss before we send this off to OPIC").

Defendant also took a leadership role in obtaining financing from ASMED, the Afghan Rural Finance Company ("ARFC"), and Afghan Growth Finance ("AGF"). Trial Exhibits 500-512 (the ASMED); 600-608 (the ARFC loan); 432-436 (the AGF application).

b. <u>Five or more participants</u>

A "participant" is one that is criminally responsible for the commission of the offense. U.S.S.G. § 3B1.1, App. Note 1; *United States v. McCoy*, 242 F.3d 499, 410 (D.C. Cir. 2001).

The government presented extensive evidence that at least four individuals in addition to defendant and Popal—Mohammad Karim Ayoubi ("Ayoubi"), Khalid Bahramuddin ("Khalid"), Arash Ahmad Basir ("Basir"), and Syed Shujauddin ("Syed")—played central roles in the fraud scheme that defendant controlled, rendering them participants. Trial Transcript, 9/13/2018, a.m., at 751-765. The government referred to each participant in the Indictment. ECF #1 at 5, ¶17

(referring to Popal as defendant's "Consultant"); 3, ¶8 (referring to Ayoubi as defendant's "Business Partner"); 4, ¶12 (referring to Khalid as the "Saheb Zada Partner"); 3, ¶11 (referring to Basir as the "Afghan Stone Partner"); 4, ¶13 (referring to Syed as the "Big Five/Diversified World Partner"); *see also,* Government Trial Exhibit 811a-d (showing the participants and their involvement in defendant's scheme).

Defendant exercised authority over these participants, referring to them as his workers or staff, and making decisions for them. Government Trial Exhibits 31 ("this is the copy of the passport for [Basir and Syed] that i would like them to come to Italy as soon as possible"); 32 ("I am planning to come to Italy shortly and i would like to bring [Basir] from Dubai with me to see the factory. He is from Equity capital trading. partner with me").

Special Agent Watts testified at length to each of the participants' involvement in defendant's scheme, connecting each to Equity Capital Trading, LLC ("ECT"), the shell companies that defendant owned or controlled (Saheb Zada, Afghan Stone, Big Five World Logistics, and Diversified World General Trading ("DWGT")), the Marble Mine, and ECM. *See* Trial Transcript, 9/13/2018, a.m., at 753 (Q: "And how did you establish that Mr. Ayoubi was a partner or an employee of Equity Capital Trading?" A: "There were actually documents that identified Mr. Ayoubi as a shareholder of the factory."); at 754 (Q: "And what does [Government Trial Exhibit 822 at 2] identify [Mr. Ayoubi] as [with respect to ECT]? A: "The stakeholder"); at 754 ("Q: And now working to the right, how did you establish that Mr. Khalid was involved with Equity Capital Trading?" A: "Through emails"); at 755 ("We also had emails that included passport information, and in that passport was a Visa for the UAE and it identified [Basir] as a partner for Equity Capital Trading"); *see also*, Government Trial Exhibit 31 at 3-8 (Basir's and Syed's passports and visas).

Special Agent Watts also drew connections between defendant, the participants, and the shell companies from the invoices that defendant submitted to OPIC, for example, testifying that Basir's same contact information was associated with ECT and the shell company Afghan Stone. Trial Transcript, 9/13/2018, a.m., at 756-62; Government Trial Exhibits 32, 103-4, 509.

Special Agent Watts further testified that the participants were listed, along with defendant in many cases, on the shell companies' bank accounts. *See, e.g.*, Trial Transcript, 9/13/2018, a.m., 766-67 (Q: "Now, I want to talk about the vertical lines that you've drawn between the people that you've connected to Equity Capital Trading and the companies, the invoice companies, that you've put in or that are in green. How did you make those connections?" A: "Most of them came from bank records"); *see also,* Government Trial Exhibits 700-704.

Finally, Special Agent Watts testified that the participants assisted defendant in laundering the proceeds of the OPIC loan. *See, e.g.*, Trial Transcript, 9/13/2018, p.m., at 821-824 (testifying that Ayoubi, defendant's uncle, withdrew $821,000 in cash from the Afghan Stone bank account into which the money from OPIC was wired).

In short, the government presented extensive evidence, through exhibits and bank records, linking the participants to defendant's scheme. The government submits that each of the participants could have been found guilty as co-conspirators, aiders and abettors, or, in some cases, principals. Accordingly, there was a preponderance of evidence that they were participants for the purposes of applying the four-level organizer and leader enhancement to defendant's offense level.

c.   Otherwise Extensive

Even if the Court decides there is insufficient evidence that defendant's offenses included five participants, it should find that defendant's criminal activity qualifies as "otherwise extensive under section U.S.S.G. § 3B1.1. To determine whether an offense was "otherwise extensive" the

sentencing court must "look primarily or solely to the number of persons involved in the criminal activity, *criminally or noncriminally*." *United States v. Wilson*, 240 F.3d 39, 47 (D.C. Cir. 2001) (emphasis added). This analysis is "not so much about extensiveness in a colloquial sense as about the size of the organization in terms of persons involved that defendant organized or led." *Id*. at 49 (internal quotations omitted).

Defendant's scheme involved many more than five people. As set forth above, defendant's scheme involved at least the five participants. His brother and ex-wife were also involved. ECF #107 at 15-16. The Court heard evidence of Stefano Simone's involvement in the generation of false documents used in the scheme. Government Trial Exhibits 39, 433 (defendant directed Stefano Simone to create a false record of payments received by Gaspari Menotti). Finally, defendant's scheme involved additional people that may have been unwitting participants, but nonetheless were instrumental in defrauding OPIC. For example, the Deputy Chief Financial Officer of Equity Capital Group sent defendant the DWGT invoices that were included in the third disbursement request. Government Trial Exhibit 410 at 1.

For the reasons set forth above, there is a preponderance of evidence that defendant's scheme qualifies as otherwise extensive, and accordingly, a four-level role enhancement applies.

4.  **A downward departure or a variance from the guidelines range is not appropriate.**

It is difficult to determine whether defendant is seeking a downward departure or a variance from the applicable guidelines range. ECF #107 at 18-20. Defendant does not point to a U.S.S.G. factor that would warrant a downward departure. *Id.* He also does not cite any of the factors under 18 U.S.C. § 3553(a) that might justify a variance. *Id.*

Instead, defendant repeats many of the arguments made in his combined post-trial motion, ECF #105, and earlier in his sentencing memorandum, ECF #107. To defendant's claim that he

"set out to help Afghanistan and its people, during a time when many Afghani citizens had few options for legitimate work and legitimate income," ECF #107 at 19, the government submits that it has never challenged defendant's good intent toward Afghanistan and developing the marble industry. Trial Transcript, 9/18/2018, at 1261 (Government Rebuttal Argument: "Nobody is suggesting that Mr. Doost went to Afghanistan with the immediate intent to defraud the United States"). To defendant's assertion that much of the OPIC loan proceeds were spent on equipment that is "accounted for in legitimate business purchases," *id.*, the government submits that it never contended that no OPIC money was used to purchase equipment for the Marble Mine. Trial Transcript, 9/18/2018, at 1261 (Government Rebuttal Argument: "And nobody is contesting that he didn't use some of [the OPIC] money to develop the marble industry"). The government's central theory—on which basis the jury found defendant guilty—was that defendant *obtained* the OPIC money by fraud, including reporting no affiliations with the shell companies, laundered the money, and did not repay any of the loan principal. ECF #106 at 12-13.

Defendant's attempts to minimize his role, deflect responsibility for his own actions, and blame the victim highlight his complete failure to accept responsibility. The government respectfully submits that the Court should reject defendant's request for a departure or variance and sentence him within the applicable sentencing guidelines.

Respectfully submitted,

ROBERT A. ZINK
Acting Chief, Fraud Section

/ s /  *Michael P. McCarthy*

_____

DANIEL P. BUTLER
D.C. Bar #417718
MICHAEL P. MCCARTHY
D.C. Bar #1020231
Trial Attorneys, Fraud Section

Criminal Division
United States Department of Justice
1400 New York Avenue, NW, Fourth Floor
Washington, D.C. 20530
(202) 307-2184 (Butler)
(202) 305-3995 (McCarthy)
Daniel.Butler2@usdoj.gov
Michael.McCarthy2@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on March 21, 2019, a copy of the foregoing document has been sent via ECF to counsel of record for the defendant.

/ s /  *Michael P. McCarthy*

_____

DANIEL P. BUTER
MICHAEL P. MCCARTHY
Trial Attorneys, Fraud Section
Criminal Division
United States Department of Justice

11